## IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| JACQUELYN PENDERGRAFT and JIMMY DON PENDERGRAFT, as parents and next of Kin of JOSHUA PENDERGRAGT, deceased,<br><br>　　　　　　Plaintiffs,<br><br>v.<br><br>BOARD OF COUNTY COMMISSIONERS OF GREER COUNTY, OKLAHOMA, JACKIE JENKINS, individually and in his official capacity as Greer County Sheriff, SHERRY SULLIVAN, individually, SHAWN LECKIE, individually, and JANE and JOHN DOES I–X, individually,<br><br>　　　　　　Defendants. | Case No. CIV-22-806-JD<br><br>ATTORNEY'S LIEN CLAIMED<br>JURY TRIAL DEMANDED |

## COMPLAINT

COMES NOW Jacquelyn and Jimmy Don Pendergraft (collectively "Plaintiffs"), as parents and next of kin of Joshua Pendergraft, deceased ("Joshua"), and for their causes of action against Defendants Board of County Commissioners of Greer County, State of Oklahoma ("Board"), Jackie Jenkins, individually and in his official capacity as Greer County Sheriff ("Sheriff"), Sherry Sullivan, individually ("Sullivan"), Shawn Leckie, individually ("Leckie"), and Jane and John Does I–X, individually, state as follows:

1. Plaintiffs are individuals and residents of the Western District of Oklahoma.

2. Board is a political subdivision of the State of Oklahoma, and its current county seat is in Mangum, Oklahoma, which is within the bounds of the Western District

of Oklahoma. Defendant Board is responsible for overseeing governmental functions of and for Greer County, including the Greer County Jail (the "Jail").

3. The Sheriff is and was the Greer County Sheriff and, at all times relevant hereto, was responsible for ensuring the safety and well-being of inmates detained at the Jail. Under Okla. Stat. tit. 57, §47, the Sheriff is obligated to ensure that the Jail conforms to applicable laws and regulations. Additionally, the Sheriff is and was at all times relevant hereto, responsible for creating, approving and enforcing the rules, regulations, policies and procedures of the Jail, including those pertaining to the safety and well-being of pretrial detainees. Upon information and belief, the Sheriff is a resident of Greer County, which is located within the Western District of Oklahoma. During all relevant times described below, the Sheriff acted under color of law.

4. Upon information and belief, Sullivan is a resident of Greer County, which is located within the Western District of Oklahoma. During all relevant times described below, Sullivan served as the Jail Administrator and acted under color of law.

5. Upon information and belief, Leckie is a resident of Greer County, which is located within the Western District of Oklahoma. During all relevant times described below, Leckie served as the on-duty Jailer and acted under color of law.

6. Defendants Jane and John Does I–X are individual Jail personnel who were at the relevant times at the Jail, acting under color of law, and responsible, in part, for ensuring that Joshua received appropriate medical care including mitigation of a known suicide risk while detained at the Jail. Defendants Jane and John Does I–X are currently

unknown to Plaintiff. Plaintiff may seek leave to amend the Complaint when these persons are known and ascertained by Plaintiff through discovery.

## JURISDICTION AND VENUE

7. Plaintiff brings this action under 42 U.S.C. § 1983 and the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

8. This Court has federal question jurisdiction under 28 U.S.C. § 1331.

9. Venue is proper in this district under 28 U.S.C. § 1391(b).

## FACTUAL ALLEGATIONS

10. Plaintiffs incorporate the above allegations by reference.

11. At the time of his death, as described below, Joshua was a 38-year-old man, who had been an x-ray technician at Mangum Hospital.

12. Although he was divorced in the years leading up to his death, Joshua had previously been married for sixteen years and was the father of two teenage girls from the marriage.

13. In the years leading up to his death, Joshua struggled with addiction and was in and out of jail.

14. Joshua was received into the Jail on or about June 14, 2020, after being arrested.

15. Because he could not make bail, Joshua remained in pre-trial detention at the Jail until the time of his death in September 2020.

16. In the days leading up to his death in September 2020, Joshua wrote a letter to his brother, Jeremy Pendergraft.

17. In the letter, Joshua made a heartfelt apology to his brother about the pain that he had caused his family and for how he had treated his brother.

18. Joshua further recounted how, after learning that he had lost custody of his teenage daughters, he had tied a noose with an electric cord that was running down the wall and put it around his neck.

19. But Joshua said that he decided not to hang himself at that time because he needed to get right with God before he committed suicide.

20. Although Joshua reported some positive developments after the near suicide attempt, he ended the letter by saying, "I love you, bubba. I really do. And I'm done. I'm done. Losing custody of my girls was rock bottom. Tell mom and dad I love them too."

21. Jail staff read Joshua's letter and were put on notice of Joshua's risk of suicide. On information and belief, the Sheriff, Sullivan, Leckie, and Jane and John Does I–X read or were informed of the contents of the letter and comprehended the risk that Joshua, a pre-trial detainee, would commit suicide

22. Indeed, Sullivan, who was the Jail Administrator at the time of Joshua's death, had previously (in May 2018) been serving as Jailer when she discovered an inmate that had committed suicide by hanging herself with a phone cord.

23. Despite the general and specific knowledge as to the serious risk to Joshua's life as a result of his current mental-health state and his plan to use an electric cord to hang himself, Defendants were deliberately indifferent to Joshua's medical needs/suicide risk and the availability of means (such as the electric cord that was ultimately used) for Joshua to take his own life.

24. Indeed, Defendants made no efforts to implement any suicide-mitigation efforts, such as isolating Joshua in a cell without means to commit suicide (such as the cord described in his letter, bedding, and the like), making sure that Joshua was consistently observed, or providing Joshua mental health care to address his suicidal ideations.

25. As detailed below, later investigation showed that Defendants failed to even meet the basic requirement of hourly sight checks and 24-hour supervision, required as to all prisoners, regardless of suicide risk, under Okla. Stat. tit. 74, § 192.

26. The above facts show that Defendants were deliberately indifferent to the serious risk that Joshua would commit suicide.

27. On September 12, 2020, Leckie discovered Joshua in the corner of his cell hanging from an electric cord from the ceiling.

28. Leckie obtained help from inmates to get Joshua down.

29. EMS was called, and Joshua was eventually transported to a medical facility in Oklahoma City.

30. The Sheriff called Jimmy Don Pendergraft early in the morning on September 12, 2020, and informed him of the above facts and of Joshua's condition.

31. Upon arrival at a medical facility in Oklahoma City, Joshua was brain dead, and the decision was ultimately made to end life support, at which time Joshua was pronounced dead on September 13, 2020.

32. After the above events, based on an allegation of missed sight check made on September 14, 2020, the Oklahoma State Department of Health investigated the Greer County Jail and the circumstances surrounding Joshua's death.

33. The Oklahoma State Department of Health's review of records revealed that hourly sight checks were not performed and/or documented as required by Okla. Stat. tit. 74, § 192. As a result the Oklahoma State Department of Health ordered the facility administrator to develop and implement written policies and procedures for the safety, security, and control of staff, inmates, and visitors, requiring visual sight checks every hour, which shall include all areas of each cell, and documentation of such sight checks.

34. But for Defendants' deliberate indifference to the serious risk that Joshua would commit suicide and Defendants' failing to take any efforts to reduce the risk of suicide, Joshua would not have died.

**FIRST CAUSE OF ACTION—VIOLATION OF 42 U.S.C. § 1983 AGAINST SHERIFF JACKIE JENKINS IN HIS OFFICIAL CAPACITY**

35. Plaintiffs incorporate the above allegations by reference.

36. Defendant Sheriff, as the duly elected Sheriff of Greer County, was the final policy maker for all policies and decisions concerning the Jail, including all policies and decisions concerning the health and safety of detainees such as Joshua.

37. The circumstances that the Sheriff and Deputies of Greer County came in contact with and remained in contact with Joshua, as described above, arose under circumstances that constitute a usual and recurring situation with which the Sheriff and Deputies of Greer County must deal.

38. Further, the Sheriff was aware that his implemented policy was deficient, not least because of the above-described incident in May 2018, in which another inmate hanged

herself with a phone cord. Yet the Sheriff took no measures to update his policy to ensure suicide-prevention measures were instituted.

39. Even without the specific incidents, which made the Sheriff aware that his policy was deficient, the risk of suicide in an inmate population is obvious, and the inadequacy is so likely to result in the violation of constitutional rights, that the Sheriff can reasonably be said to have been deliberately indifferent to the need for an adequate policy.

40. To the extent that the Sheriff had suicide-prevention measures in place, the Sheriff knew that his Deputies were not sufficiently trained in such policies and ignored consistent failures to act consistently with such policies.

41. The inadequate training, supervision, or discipline exhibited by the Sheriff to his Deputies demonstrates a deliberate indifference on the part of the Sheriff toward persons such as Joshua, who suffered from suicidal ideations and other attendant mental-health limitations with whom the Sheriff and his Deputies regularly come in contact.

42. If the Sheriff had implemented suicide-prevention policies and provided the appropriate training, supervision, and discipline to his Deputies, as set forth above, the constitutional violation would not have occurred.

43. The foregoing actions and inactions of Defendants in being deliberately indifferent to Joshua's medical needs in violation of the Fourteenth Amendment are causally connected with customs, practices, and policies which the Board/Sheriff promulgated, created, implemented, and enforced. The Sheriff in his official capacity is liable for the unconstitutional acts that culminated from these customs, practices, and policies.

44. As a direct and proximate result of these actions and inactions that deprived Joshua of his constitutional rights, Joshua sustained pain, personal injuries, mental injuries, and ultimately death.

45. Plaintiffs seek to enforce and recover all rights and remedies provided under 42 U.S.C. § 1983 or otherwise available under the law.

WHEREFORE, Plaintiffs pray for judgment as follows:

(1) For actual damages in a sum in excess of $75,000.00;

(2) For punitive and exemplary damages as determined by the jury at the time of trial;

(3) For interest thereon as provided by law;

(4) For the costs and expert fees as provided by 42 U.S.C. §1983;

(5) For any other such relief and further relief as the Court deems just and proper, whether that is specifically requested herein or requested at a later date.

**SECOND CAUSE OF ACTION—VIOLATION OF 42 U.S.C. § 1983 AGAINST BOARD OF COUNTY COMMISSIONERS OF GREER COUNTY**

46. Plaintiffs incorporate the above allegations by reference.

47. As a municipality that oversees the Jail, Defendant Board has a constitutional duty to provide adequate training and appropriate training to its commissioned employees. Further, Defendant County is responsible for the actions of its Sheriff as the final policy maker for county jails.

48. As a direct and proximate result of the actions and inactions of Defendant Board, as described above, that deprived Joshua of his constitutional rights, Joshua sustained personal injuries, mental injuries, medical expenses, and ultimately death.

49. Plaintiffs seek to enforce and recover all rights and remedies provided under 42 U.S.C. § 1983 or otherwise available under the law.

WHEREFORE, Plaintiffs pray for judgment as follows:

(1) For actual damages in a sum in excess of $75,000.00;

(2) For punitive and exemplary damages as determined by the jury at the time of trial;

(3) For interest thereon as provided by law;

(4) For the costs and expert fees as provided by 42 U.S.C. §1983;

(5) For any other such relief and further relief as the Court deems just and proper, whether that is specifically requested herein or requested at a later date.

### THIRD CAUSE OF ACTION—VIOLATION OF 42 U.S.C. § 1983 AGAINST THE INDIVIDUAL DEFENDANTS

50. Plaintiffs incorporate the above allegations by reference.

51. At the time of the actions described herein, the rights of Joshua were codified, established, and sufficiently clear that every reasonable officer would have understood that the failure to provide medical care and attention to the serious medical and psychological needs of an arrestee violated his constitutional rights.

52. The actions of the individual Defendants, as described above, amounted to deliberate indifference to a known risk that Joshua, a pre-trial detainee, would commit suicide, directly resulting in a violation of Joshua's constitutional rights.

53. At the time of the actions described above and despite direct knowledge of Joshua's risk of suicide and the general risk of suicide as a result of available cords and a lack of sight checks, the need for intervention and suicide-risk mitigation were so obvious that even a lay person would easily recognize the need for suicide-risk-prevention measures and provision of mental health care.

54. At the time of the actions described herein and despite direct knowledge of Joshua's suicidal ideations and further displayed by their actions and inactions, the individual Defendants knew that Joshua faced a substantial risk of harm, and they disregarded that risk by failing to take reasonable actions to abate the risk.

55. As a direct and proximate result of the action and inaction of the individual Defendants, as described above, Joshua failed to receive any mental health care or the provision of any suicide-risk mitigation while confined within a cell of the Jail.

56. As a direct and proximate result of the action of the individual Defendants, as described above, Joshua sustained personal injuries, mental injuries, medical expenses, and ultimate death.

57. Plaintiffs seek to enforce and recover all rights and remedies provided under 42 U.S.C. § 1983 or otherwise available under the law.

WHEREFORE, Plaintiffs pray for judgment as follows:

(1) For actual damages in a sum in excess of $75,000.00;

(2) For punitive and exemplary damages as determined by the jury at the time of trial;

(3) For interest thereon as provided by law;

(4) For the costs and expert fees as provided by 42 U.S.C. §1983;

(5) For any other such relief and further relief as the Court deems just and proper, whether that is specifically requested herein or requested at a later date.

                          Respectfully submitted,

*s/Jonathan M. Irwin*
Jonathan M. Irwin, OBA#32636
Ward & Glass, L.L.P.
1601 N. W. 36th Street, Suite 100
Norman, Oklahoma 73072
405-360-9700
405-360-7902 (fax)
jonathan@wardglasslaw.com
ATTORNEYS FOR PLAINTIFF